

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-10-1996

# LeJeune v. Bliss-Salem, Inc.

Precedential or Non-Precedential:

Docket 95-1741

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"LeJeune v. Bliss-Salem, Inc." (1996). *1996 Decisions.* Paper 148.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/148

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 95-1741
_____

EDWARD C. LEJEUNE; DEBORAH LEJEUNE,

                                        Appellants

            v.

BLISS-SALEM, INC.; E.W. BLISS COMPANY;
        GENERAL ELECTRIC CO.,

                                        Appellees

_____

On Appeal from the United States District Court
    for the Eastern District of Pennsylvania
      D.C. Civil Action No. 94-cv-06729
_____

Argued:  March 19, 1996

Before:  BECKER, McKEE and McKAY, Circuit Judges

(Filed  June 10, l996)

                    Michael J. McCaney, Jr. (ARGUED)
                    Heller, Kapustin, Gershman & Vogel
                    486 Norristown Road, Suite 230
                    Blue Bell, PA  19422

                    Attorney for appellant


                    Keith D. Heinold (ARGUED)
                    Craig S. Hudson

                    Marshall, Dennehey, Warner,
                      Coleman & Goggin
                    1845 Walnut Street
                    Philadelphia, PA  19103

                    Attorneys for appellee General

                            Electric Co.


                    John R. McHaffie (ARGUED)
                    Frayne & Hatzell
                    2005 Market Street, Suite 3150
                    Philadelphia, PA  19103

Attorney for appellee Bliss-
                                        Salem, Inc.

_____

OPINION OF THE COURT
_____

McKAY, Circuit Judge.

Appellants Edward and Deborah LeJeune appeal from the district court's grant of summary judgment for the Appellees Bliss-Salem, Inc. and General Electric Co. The LeJeunes brought this negligence and strict products liability action against Appellees when Mr. Lejeune was injured while working on a piece of machinery Appellees had repaired. For the reasons that follow, we affirm the district court.

I.

Mr. LeJeune, a Pennsylvania resident, worked at a Delaware steel mill as an "oiler" or "lube man." As such, he was responsible for checking the oil and lubrication of various machines. Mr. LeJeune's accident occurred on a piece of machinery known as a "table." Tables consist of a frame which holds large steel cylinders weighing two to five tons each. The cylinders, powered by motors, are rotated in order to transport hot steel slabs from one processing machine to another. Gaps, approximately two inches in width, exist between cylinders. Mr. LeJeune, believing a certain table was deactivated, jumped on top of the cylinders in order to do his maintenance work. The cylinders were activated, and, as they began to roll, Mr. LeJeune was caught in the gap between them. His injuries were serious and extensive.

Appellees' involvement with the steel mill began when CitiSteel, the owner of the mill, hired Appellees in 1988 to refurbish the steel mill machinery. The mill had been shut down for two years and had deteriorated into a serious state of disrepair. General Electric employees were on-site for eight months repairing equipment. Some refurbishing work took place at a General Electric shop in Pennsylvania. Bliss-Salem performed most of its refurbishing work at its Ohio plant. Appellees finished their work

at the steel mill approximately three years before Mr. LeJeune's accident occurred.

Basing their claim on tort theories of negligence and strict products liability, Appellants argue that the contracts between CitiSteel and Appellees created a duty requiring Appellees to redesign the steel mill equipment, eliminating any safety problems. They argue that this duty included a duty to warn of any hazards inherent in the machinery. Appellees argue that the contracts simply required them to put the mill machinery back into working order and that any duty on their part did not extend to reevaluating the safety aspects of the various machinery involved.

## II.

Before we address the tort issues in this case, we must first decide which state's law applies. In choosing which law applies, a federal court sitting in diversity must apply the choice-of-law rules of the forum state. Klaxon v. Stentor Electric Mfg. Co., 313 U.S. 487, 496 (1941); Shuder v. McDonald's Corp., 859 F.2d 266, 269 (3d Cir. 1988). Appellants brought this action in the United States District Court for the Eastern District of Pennsylvania. Thus, we must apply Pennsylvania's choice-of-law rules.

Pennsylvania choice-of-law analysis consists of two parts. First, the court must look to see whether a false conflict exists. Then, if there is no false conflict, the court determines which state has the greater interest in the application of its law. SeeCipolla v. Shaposka, 439 Pa. 563, 565 (1970); Lacey v. Cessna Aircraft Co., 932 F.2d 170, 187 & n.15 (3d Cir. 1991) (applying Pennsylvania choice-of-law rules for purposes of forum non conveniens analysis). A false conflict exists where "only one jurisdiction's governmental interests would be impaired by the application of the other jurisdiction's law." Lacey, 932 F.2d at 187. Here, no false conflict exists. Pennsylvania law recognizes strict products liability to protect its citizens from defective products and to encourage manufacturers to produce safe products. Delaware law, however, does not recognize strict products liability based on the rationale that such claims are preempted by the Uniform Commercial Code. Cline v. Prowler Indus. of Maryland, Inc., 418 A.2d 968 (Del. 1980). Applying Delaware law would impair Pennsylvania's interest in protecting

its citizen, Mr. LeJeune.

On the other hand, Delaware's interests would be impaired if Pennsylvania law were applied. Delaware has an interest in prescribing the rules governing torts occurring nonfortuitously within its borders. Under Pennsylvania choice of law analysis, a false conflict exists "where the accident is fortuitous and the state where the accident occurred has no interest in the regulatory standard at issue." Reyno v. Piper Aircraft Co., 630 F.2d 149, 170 (3d Cir. 1980), rev'd on other grounds, 454 U.S. 235 (1981); accordKuchinic v. McGrory, 422 Pa. 620, 624 (1966) (holding that false conflict existed because Georgia had no recognizable interest when accident's occurrence in that state was wholly fortuitous).

Here the occurrence of the accident in Delaware was not fortuitous. Delaware was the site of the accident (as well as the place where much of the alleged negligent conduct took place) because of the steel mill's fixed location in that state. If Pennsylvania law were applied, Delaware's interest in regulating purposeful economic activity within its borders would be impaired. We cannot agree with Appellants' assertion that Delaware has no interest in this case simply because Appellees have limited contacts with that state. A state's interest in enforcing its tort law is not constrained to protecting residents from harm or suit. See Schmidt v. Duo-Fast, Inc., No. 94-6541, 1995 WL 422681, at *1-2 (E.D. Pa. July 5, 1995) (holding that New Jersey law applied when New Jersey was the nonfortuitous site of accident even though defendant, which benefited from New Jersey law, was Illinois corporation). A state could have a host of reasons for limiting liability, including encouraging economic activity in the state (such as the rebuilding of the steel mill), and lowering costs to consumers (such as CitiSteel). Also without merit is Appellants' argument that, because Delaware's rejection of strict liability is based on its minority view that the Uniform Commercial Code preempts such a claim, its rejection of strict liability reflects no policy choice by the state. Delaware's decision to adopt and maintain the Uniform Commercial Code in light of this interpretation is obviously a policy choice. Thus, a false conflict does not exist in this case.

We must next examine which state has a greater interest in having its law applied. In making this determination, we look

> to see what contacts each state has with the accident, the contacts being relevant only if they relate to the "policies and interest underlying the particular issue before the court." When doing this it must be remembered that a mere counting of contacts is not what is involved. The weight of a particular state's contacts must be measured on a qualitative rather than quantitative scale.

Cipolla v. Shaposka, 439 Pa. 563, 566 (1970) (citations omitted). In this case, Pennsylvania's only contact with the accident is the fact that Mr. LeJeune is a Pennsylvania resident and that a small portion of General Electric's work took place at a shop in Pennsylvania. The Delaware contacts, however, are more substantial. The accident occurred in Delaware, and most of the alleged negligent conduct took place there as well. Additionally, as pointed out before, the accident's occurrence in Delaware was not fortuitous. Where the site of an accident is not fortuitous, "the place of injury assumes much greater importance, and in some instances may be determinative." Shields v. Consolidated Rail Corp., 810 F.2d 397, 401 (3d Cir. 1987); Shuder v. McDonald's Corp., 859 F.2d 266, 272 (3d Cir. 1988). Looking at these contacts qualitatively, we believe that Delaware has the greater interest in having its law applied. Delaware's contacts with the accident relate to substantive aspects of the case such as how and why certain conduct occurred. Pennsylvania's contact arises not from substantive matters in the litigation but rather from Mr. LeJeune's residence. Thus, we hold that Delaware law applies to this case.

## III.

Applying Delaware law, we can immediately dispose of Appellants' product liability claim. Appellants' claim fails because Delaware does not recognize strict products liability. Cline v. Prowler Indus. of Maryland, Inc., 418 A.2d 968 (Del. 1980). Thus, we proceed to consider Appellants' remaining claim of negligence. Essentially, the parties dispute whether Appellees owed any duty to Mr. LeJeune. Appellants propose several theories under which a duty would arise in this case. They

argue that a duty was created by the contracts between the steel mill owner and Appellees, by the foreseeability of harm, and by public policy. Appellants also argue that a duty was created under Restatement Second of Torts 404. Because these theories of liability are all predicated on a duty, and because the only way the Appellees could have created a duty in this case is through contract, we believe that a discussion of duty under section 404 will dispose of all the claims brought by Appellants. Where, as here, a contract is unambiguous, it is appropriate for the court to determine its meaning as a matter of law at the summary judgment stage. See Pellaton v. Bank of New York, 592 A.2d 473, 478 (Del. 1991).

Before addressing section 404, we point out that the Delaware Supreme Court has never addressed the applicability of this particular section of the Restatement Second of Torts. We do not need to decide, however, whether the court would adopt the section because, even assuming that it would, we do not believe it creates a duty in this case. Section 404 provides:

> One who as an independent contractor negligently makes, rebuilds, or repairs a chattel for another is subject to the same liability as that imposed upon negligent manufacturers of chattels.

Although this language sweeps broadly, it does not impose liability on an independent contractor for work which the independent contractor did not undertake to perform. Seesection 404 Comment a (independent contractor required to do competently everything "which he undertakes . . . ."). Rather, it is the scope of the undertaking, as defined in the contract, which gives shape to the independent contractor's duty in tort.

Appellants argue that the contracts entered into by Appellees required them either to warn of safety defects in the machinery or to redesign the machinery in such a way as to eliminate potential hazards. Appellants point to broad language in the contracts such as "General Electric will check the delineated apparatus, analyze, and report findings" and "[w]hereas [CitiSteel] desires to refurbish and revamp the equipment . . . and [Bliss-Salem] is qualified and willing to do the work as specified . . . ." App., Vol. II, at 583 (General Electric contract); id. at 628 (Bliss-Salem contract). In particular,

Appellants make much of the term "revamp" in the contract. Because Webster's Unabridged Dictionary defines that term as "to renovate, redo, or revise," they argue, Appellees assumed a duty to redesign defective parts of the plate mill. However, not only does "renovate, redo, or revise" not necessarily mean "redesign," our version of Webster'slists "to put in repair" as the first definition of "revamp." This definition is entirely consistent with Appellees defense: that their undertaking was limited to "repairing" the mill. In any event, the contract simply states, as a preamble, that Appellant "desires to refurbish and revamp the equipment." The scope of work that Appellee (as opposed to Appellant) agreed to undertake (as opposed to merely desired) is described later in Article I.

The contracts contain, moreover, much more specific language indicating that Appellees were hired to do repair work only. Each contract fills several pages with detailed descriptions of repair work for each machine. For example, the General Electric contract provides the following "scope" for repair of a water pump:

External aluminum oxide blast clean.
Disassemble, clean & visual plus dimensional    inspection. *
Assemble (new bearings, gaskets, "O" rings, bolts).
Report.

App., Vol. II, at 589 (General Electric contract). The Bliss-Salem contract is full of similar language. Appellants do not point us to any language in the contracts which specifically required Appellees to redesign a machine or to warn of safety defects. Although the Bliss-Salem contract does contain a few provisions which call for the redesign of particular machine parts, Appellants have failed to alert the court to any provisions which required the redesign of the machinery involved in Mr. LeJeune's accident. No language in either contract specifically addresses the safety aspects of any piece of machinery. Thus, it is clear from reading the contracts that Appellees undertook to repair rather than redesign the steel mill machinery.

Appellants also attempt to show that Appellees undertook to do more than simple repair work by citing to the following deposition excerpt of Mr. Hearn, a CitiSteel official:

Q.   Now let me ask you if the original specification was deficient, would you expect the contractor to tell you that?

. . . .

A.    Yes.    If there was something deficient about a piece of equipment, I would expect somebody to tell me.  I'm not an engineer myself.  And if we sent a piece of equipment out to Bliss or GE was here and they saw something and said, "Joe, this is not designed correctly, we recommend you don't do this," fine, I listen.

App., Vol. I, at 176 (Hearn deposition excerpt).  This statement is at best ambiguous concerning Appellees' supposed duty to redesign and warn about safety aspects of the machinery.  In fact, Mr. Hearn also stated in his deposition that Appellees were not required to evaluate safety procedures and were only required to bring machinery back to its original working order.  Id. at 172-73.  Even were we to construe Mr. Hearn's statement as Appellants' wish, it would be clearly contradicted by the clear intent of the parties as expressed in the contracts themselves.  Mr. Hearn's statement does not change the fact that the contracts did not require Appellees to concern themselves with safety design.  Due to the limited nature of the contractual undertaking in this case, no duty in tort arose on the part of Appellees to redesign safety features of the equipment or to warn of potential hazards.

Even where the scope of an independent contractor's undertaking does not give rise to liability for design problems in a product, a duty may still arise if the product is "so obviously bad that a competent contractor would realize that there was a grave chance that his product would be dangerously unsafe."  Section 404 comment a.  Appellants argue that General Electric was aware of the safety problems inherent in the machinery they were fixing.  They point to the fact that an accident similar to Mr. LeJeune's almost occurred while General Electric employees were testing equipment.  General Electric averted an accident by simply looking to see if anyone was on the equipment before energizing it.  We do not believe that this single incident, in which no accident occurred, was so "obviously bad" that it would give rise to a duty not contemplated in the original contract.

The judgment of the district court will be affirmed.

_____